UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON DAVID RICO,<br><br>                              Petitioner,<br><br>v.<br><br>DAVID HOLBROOK, Warden, et al.,<br><br>                              Respondents. | Case No.:  22cv701-AGS(LR)<br><br>**REPORT AND RECOMMENDATION FOR ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**AND**<br><br>**ORDER DENYING PETITIONER'S REQUEST FOR EVIDENTIARY HEARING AND MOTION FOR APPOINTMENT OF COUNSEL [ECF NO. 1]** |

This Report and Recommendation is submitted to the Honorable Andrew G. Schopler, United States District Judge, pursuant to 28 U.S.C. § 636 (b)(1) and Civil Local Rules 72.1(d) of the United States District Court for the Southern District of California. On May 16, 2022, Petitioner Aaron David Rico, a state prisoner proceeding *pro se*, commenced these habeas corpus proceedings pursuant to 28 U.S.C. § 2254 by filing a Petition for Writ of Habeas Corpus ("Petition").  (ECF No. 1.)  Respondents filed an

Answer to Plaintiff's Petition, and Petitioner filed a Traverse.  (ECF No. 10; ECF No. 15.)

The Court has considered the Petition, Answer, Traverse, and all supporting documents filed by the parties.  For the reasons set forth below, the Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.  The Court also **DENIES** Petitioner's request for an evidentiary hearing and motion for appointment of counsel.

## I. FACTUAL BACKGROUND

The following facts are taken from the California Court of Appeal's opinion in People v. Rico, Appeal No. D074546.[1]  (See Lodgment 54.)  This Court presumes the state court's factual determinations to be correct, absent clear and convincing evidence to the contrary.  See 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

In early 2016,[2] a series of home burglaries and robberies occurred on six days in San Diego County.  Detectives investigating the crimes dubbed the suspects the "Open Door Bandits" because they always entered through unlocked or open doors.  The victims stated that the suspects were of different races, something the police considered unique.  The suspects typically used zip ties, shoelaces, and scarves to tie up the residents.  The suspects took jewelry, money, personal electronics and gaming systems. Briefly, the crimes were as follows:

> January 24 home burglary (counts 1, 2)
> January 24 home burglary (counts 1, 3)
> January 26 home burglary (counts 4, 5)
> January 29 home robbery and burglary (counts 6–10)
> January 31 home robbery, burglary and sexual assault (counts 11–15)
> February 5 home robbery and burglary (counts 16–19)
> February 11 home robbery and burglary (counts 20–24)

---

[1]  The California Court of Appeal's reference to "appellants" in its written decision referred to Petitioner and Co-Defendant Thomas Smith.  (See Lodgment 54 at 3.)

[2]  All undesignated date references are to 2016.

February 11 home robbery and burglary (counts 25–28)
February 11 home burglary (count 29)
February 11 home burglary (count 30)

Crime scene evidence ultimately led to appellants' arrests and the arrest of their five cohorts: Stephen Gomez, Robin Shawver, Aaron Rico V, Victor Harvey and Jordan Wilson.[3]  Appellants' cohorts pleaded guilty to various charges.  Appellants were tried before a single jury.

During closing argument, Smith's counsel conceded his client's guilt on all charges except counts 11 to 15, the incident where the victim, Jane Doe, was sexually assaulted by a Black man.[4]  During closing argument, Rico's counsel essentially conceded his client's guilt for aiding and abetting the crimes, claiming that Rico acted as a lookout for all of the charged offenses and only went inside the homes for the crimes that occurred on February 11.  Counsel argued however, that Rico did not aid and abet the sexual assault because the assault was not foreseeable.  The jury rejected these arguments and convicted appellants of all charges, including the incident involving the sexual assault.

. . . .

January 29—Burglary and Robbery (Count 10)

On this day, Thuy H. and Dang N. slept in their bedroom when they were startled by commands to wake up.  They saw three men with their heads covered holding guns pointed towards them.  Someone asked for money and jewelry.  One man tied Thuy's feet and her hands, and gagged her with a scarf.  Another man tied Dang's hands behind his back and covered Dang's head with a t-shirt.  The men searched the home for approximately 60 minutes and ultimately found hidden gold, jewelry and cash.

The couple's daughter, M.N., and their two grandsons were asleep in another bedroom.  M.N. woke up when one of the men tried to open her bedroom door, but she had the door locked from the inside.  She heard talking and the sounds of items being moved.  She opened the door and looked downstairs where she saw her father being held at gunpoint with his hands tied and head covered.  At that moment, one of the men saw M.N. and ordered her to stop.  The man had a gun and was about six to 10 feet away

---

[3]  We refer to appellant as Rico, and Aaron Rico V as Rico V.

[4]  Smith is a Black man.

from her. She ran into her room, locked her door and called 911. The men left shortly after M.N. saw them. None of M.N.'s property was stolen.

. . . .

January 31—Jane Doe (Counts 11–15)

In the early morning hours of this day, Doe woke up to noises and heard a man tell her to get down and be quiet. She was not wearing her glasses or contact lenses. She could see about 12 to 18 inches in front of her and beyond that her vision was "pretty blurry." With the covers over her head she heard two voices speaking to her. When Doe pulled her head out from under the covers she saw a man who might have been Hispanic holding jewelry. This man wore black gloves, a black hoodie, and black pants. She then described a man wearing a white hoodie and black pants who held up the keys to her van and told her they were not going to take it.

Eventually a third man wearing dark clothes, a dark bandana, and thick dark-rimmed glasses told her to pull back her bed covers because he wanted to see what she looked like. This man appeared to be Hispanic or Asian. Another man then entered the room and told her that they were going to tie her hands. As the man tied her hands she glanced up at him. The man was Black, wore a dark hoodie and may have had a black bandana on his face.

The Black man tied a scarf over her eyes and later told her to take her clothes off. The Black man cut the shoelace binding her hands and pulled the scarf down to her neck. Doe undressed and heard the men talking about her body. She described seeing three sets of legs, but said there might have been a fourth person outside her vision. The men told her to get on the bed and had her change positions several times. The Black man re-tied her hands together and someone put a pillow case over her head. She felt hands on her body. The Black man told her to lay on her back and spread her legs. When she protested, someone pressed a gun to her arm and told her to be quiet. She felt two fingers penetrate her vagina and the gun against her arm. She did not know who had sexually assaulted her "[b]ut based on where everyone was, [she assumed] it was the Black guy." The men had her shower and then left.

. . . .

February 1—Burglary and Robbery (Count 24)

On this day, Thomas B. slept in the upstairs master bedroom of his home with his wife, Gina. His two sons were asleep in their upstairs

4

bedrooms.  Thomas heard his dog barking and growling.  He got up to investigate and found a man wearing a hoodie and a headlamp outside his bedroom door.  As Thomas started yelling he saw another man run out of his youngest son's bedroom, and a third man near his older son's bedroom.  One of the men subdued Thomas at gunpoint.

Gina also woke up when she heard the dog barking.  After Thomas opened their bedroom door she knew from the tone of his voice that strangers were in their home.  Gina ran into the hall where she saw her older son, John Doe, leaving his bedroom.  She called 911 after she heard Thomas yell, "'Don't shoot.'"  She shouted for John Doe to call 911 and told him to hide when she saw a [sic] one of the intruders coming up the stairs.

Gina ran into her younger son's bedroom and tried to close the door as one of the intruders pushed on the door.  The pair struggled over the door for almost a minute until the man gave up and the house quieted.  After hiding her sons in the master bedroom, Gina went down stairs and found Thomas lying on the floor.  Thomas told her that the men had left and taken her purse.

John Doe testified about what he saw that night.  He woke up to his dog barking and his dad yelling.  From his open bedroom door he saw what appeared to be headlights moving frantically.  He called the police in response to his mother's request and walked into the hallway.  When he looked over the banister he saw his father on the floor and some people running around.  A man stood over his father with a gun.  He saw three men in his home, all wearing black.

A person ran by his door and that person struggled to enter his brother's bedroom.  This person also had a gun.  His mother then came to his room and had him hide in the master bedroom with his brother.  The intruders took none of John Doe's property and nothing in his bedroom had been moved.

. . . .

February 5—James M. and Betsy H. (Counts 16–19)

In the early morning hours on this day, three men entered the home belonging to James and Betsy.  One of the men carried a gun.  After one man bound James's and Betsy's hands, the men moved the couple into a home office, closed the double French doors to the office, and tied the doors together.  James could not see the men's faces.  Betsy did not see the men's skin tone, but believed they were either Hispanic or Black based on their voices.

The men left with cash, the couple's wallets, electronic equipment, two cell phones, and jewelry.  Later in the day, Michael J. found Betsy's wallet in the middle of the street near a Mira Mesa shopping center.  The shopping center contained a store where some items stolen in the robbery series had been pawned.  After looking inside the wallet, Michael took it to a police station.  The wallet contained Michael's DNA.

(Lodgment 54 at 5–9, 6–17 (footnotes in the original[5]).)

## II.  PROCEDURAL BACKGROUND

### A.  Petitioner's Criminal Conviction and Direct Appeal

On June 4, 2018, a jury convicted Petitioner of one count of conspiracy to commit first degree burglary (count 4, California Penal Code section 182(a)(1)); four counts of conspiracy to commit first degree burglary and robbery (counts 6, 11, 16, 20, California Penal Code section 182(a)(1)); twelve counts of first degree robbery in concert (counts 8, 9, 10, 14, 18, 19, 22, 23, 24, 26, 27, 28, California Penal Code sections 212.5(a) and 213(a)(1)(A)); eight counts of first degree burglary (counts 5, 7, 15, 17, 21, 25, 29, 30, California Penal Code sections 459 and 460(a)); forcible sexual penetration (count 12, California Penal Code section 289(a)); and assault with intent to commit forcible sexual penetration during a first degree burglary (count 13, California Penal Code section 220(b)).  (See Lodgment 5 at 1130, 1132–35; Lodgment 6 at 1235–62.)  As to count 12, the jury found that Petitioner tied and bound the victim and that the crime was committed during a burglary, California Penal Code sections 459, 667.61(a)(c), (e); 667.61(b)(c), (e).  (See Lodgment 6 at 1243–44.)  As to counts 7, 15, 17, 21, 25, and 29, the jury found that the crimes were committed while another person, other than an accomplice, was present in the residence during the commission of burglary, in violation of Cal. Penal Code section 667.5(c)(21).  (Id. at 1238, 1247, 1249, 1253, 1257, 1261.)  On August 17, 2018, Petitioner was sentenced to a determinate sentence of thirty-five years in state

---

[5]  The Court changed the numbering of the quoted footnotes to maintain consecutive footnote numbering in this Report and Recommendation.

prison, and an indeterminate sentence of twenty-five years to life.  (See Lodgment 5 at 1130, 1132–35; Lodgment 6 at 1264–68.)

Petitioner appealed his conviction to the California Court of Appeal, arguing that (1) his "convictions in Counts 12 and 13 should be reversed due to *Brady*[6] error"; (2) there was insufficient evidence to support his robbery convictions on counts 10 and 24; and (3) the trial court erred by failing to hold an ability to pay hearing with respect to the fines and fees assessed at sentencing.  (See Lodgment 51.)  On November 19, 2020, the California Court of Appeal found that (1) Petitioner did not establish all elements of a Brady violation claim[7]; (2) substantial evidence supported Petitioner's robbery convictions on counts 10 and 24; and (3) Petitioner forfeited his ability to pay argument. (See Lodgment 54 at 6–24, 28–30.)

Petitioner filed a petition for review in the California Supreme Court raising the same claims he raised before the state appellate court.  (See Lodgment 55; see also Lodgment 51.)  On February 17, 2021, the California Supreme Court summarily denied the petition.  (Lodgment 56.)[8]

_____

[6]  Brady v. Maryland, 373 U.S. 83 (1963).

[7]  Although Petitioner's Brady violation claim raised in his appeal to the California Court of Appeal was limited to his convictions on counts 12 and 13, the state appellate court construed the claim to also raise the same Brady violation challenges as to Petitioner's convictions on counts 11, 14 and 15.  (See Lodgment 51 at 4, 42 (emphasis added) (containing Petitioner's argument that his "convictions in Counts 12 and 13 should be reversed due to *Brady* error"); Lodgment 54 at 9 (emphasis added) (containing the California Court of Appeal's decision construing Petitioner's Brady claim as challenging his "convictions for the Doe incident (counts 11 to 15) . . . based on *Brady* error").)  Petitioner was convicted of forcible sexual penetration (count 12) and assault with intent to commit forcible sexual penetration during a first degree burglary (count 13).  (Lodgment 6 at 1243–45.)  He was also convicted of conspiracy to commit first degree burglary and robbery (count 11), first degree robbery in concert (count 14), and first degree burglary (count 15).  (Id. at 1242, 1246–47.)  Like counts 12 and 13, counts 11, 14, and 15 pertained to the crimes committed at Jane Doe's residence on January 31, 2016.  (See id. at 1242–47.)

[8]  Petitioner did not seek collateral review in state court.  (See ECF No. 1 at 3.)

22cv701-AGS(LR)

**B.      Petitioner's Federal Habeas Petition**

On May 16, 2022, Petitioner filed his federal Petition in the United States District Court for the Southern District of California.  (ECF No. 1.)  Petitioner asserts the following claims: (1) "*Brady* Error.  The State Failed to disclose *Brady* evidence that was in possession of investigative agencies, to which the State had access, violating Due Process Clause of 5th & 14th Amendments"; and (2) there was insufficient evidence to support his convictions for robbery on counts 10 and 24.  (See id. at 6–7; see also ECF No. 1-2 at 2–37.)  On September 28, 2022, Respondents filed an Answer to Plaintiff's Petition.  (ECF No. 10.)  On December 1, 2022, Petitioner filed a document entitled "Reply to Answer for Writ of Habeas Corpus," which the Court construes as Petitioner's Traverse.  (See ECF No. 15.)

## III.  SCOPE OF REVIEW

Petitioner's Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 326 (1997).  Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Early v. Packer, 537 U.S. 3, 7–8 (2002).  In making this determination, a reviewing federal court must first identify the appropriate state court decision to review.  Where there is no reasoned decision from the state's highest court, the reviewing federal court "should 'look through' the unexplained decision to the last

related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." <u>Wilson v. Sellers</u>, 584 U.S. 1188, 1192 (2018); <u>see also</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803–04 (1991) (providing that a reviewing federal court may "look through" to the last reasoned state court decision).

A state court's decision is "contrary to" clearly established federal law if the state court (1) "applies a rule different from the governing law set forth in [United States Supreme Court] cases," or (2) "decides a case differently than [the United States Supreme Court] has done on a set of materially indistinguishable facts." <u>See</u> 28 U.S.C. § 2254(d)(1); <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002); <u>Williams v. Taylor</u>, 529 U.S. 362, 405–06 (2000). An "unreasonable application" of clearly established federal law occurs where the state court "identifies the correct governing legal principle [from the United States Supreme Court's decisions] but unreasonably applies that principle to the facts of the prisoner's case." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003) (quoting <u>Williams</u>, 529 U.S. at 413). "[A] federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." <u>Id.</u> at 75–76 (citations and internal quotation marks omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions as of the time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412.

Habeas relief is also available where the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(2); <u>see also</u> <u>Wood v. Allen</u>, 558 U.S. 290, 293 (2010). A reviewing federal court will not overturn a state court's decision on factual grounds unless the federal court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in state court. <u>See</u> <u>Miller-El</u>, 537 U.S. at 340; <u>see also</u> <u>Rice v. Collins</u>, 546 U.S. 333, 341–42 (2006) (the fact that "[r]easonable minds reviewing the record might

disagree" does not render a decision objectively unreasonable).  This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1); Schriro v. Landrigan, 550 U.S. 465, 473–74 (2007).

## IV.  DISCUSSION

### A.   Habeas Relief is not Warranted with Respect to Petitioner's Brady Violation Claim in Relation to His Convictions on Counts 11–15

Petitioner asserts that the State failed to timely disclose exculpatory DNA evidence linking another individual, A.B., to the Jane Doe crime scene, thereby violating Petitioner's due process rights.  (ECF No. 1 at 6; ECF No. 1-2 at 5, 5–15; ECF No. 15 at 3, 10–14.)  Petitioner argues that timely disclosure of this evidence would have provided a basis to argue that A.B., and not Petitioner, was the fourth person who committed the crimes of which Petitioner was convicted with respect to the Jane Doe incident.  (ECF No. 1-2 at 16–17; ECF No. 15 at 13–14.)  Petitioner contends that the withheld DNA evidence was material because it supported his argument that he was the lookout and that he was not inside Jane Doe's house; and since he was outside Jane Doe's house, he could not be guilty of the sex crimes.  (ECF No. 1-2 at 17; ECF No. 15 at 12–14.)  Petitioner maintains there is a reasonable probability that the withheld DNA evidence would have led to a different verdict on count 12 (forcible sexual penetration) and count 13 (assault with intent to commit forcible sexual penetration during first degree burglary).[9]  (See ECF No. 1-2 at 18–21, 23, 37; see also ECF No. 15 at 14.)

---

[9] The Court notes that in his Petition, Petitioner challenges his convictions on Counts 12 and 13 based on the alleged Brady error.  (See ECF No. 1-2 at 21 (emphasis added) (arguing that "in light of the undisclosed, favorable *Brady* evidence, it is questionable if a jury could have convicted Petitioner on Counts 12 and 13"); id. at 23 (emphasis added) (arguing that had the withheld DNA evidence been disclosed, "there is a reasonable probability that at least one member of Petitioner's jury could have had a reasonable doubt as to Petitioner's guilt in Counts 12 and 13").)  In his Traverse, however, Petitioner also references counts 11, 14, and 15.  (See ECF No. 15 at 6 (emphasis added) (containing Petitioner's "TABLE OF CONTENTS" describing "Ground 1" as "*Brady* Violation, Counts 11 through 15"); id. at 9

Respondents argue that the California Court of Appeal properly applied <u>Brady</u> to hold that there was no reasonable probability of a different result for Petitioner on the sexual assault crimes from a failure to disclose DNA evidence regarding a wallet, which was stolen and recovered several days after the Jane Doe sexual assault.  (ECF No. 10-1 at 12.)  Respondents maintain that the state appellate court's conclusion is reasonable under 28 U.S.C. § 2254(d), and Petitioner is not entitled to relief on this claim.  (<u>Id.</u> at 13.)

The California Supreme Court summarily denied Petitioner's petition, and the Court therefore must "look through" the silent denial to the California Court of Appeal's opinion.  (<u>See</u> Lodgment 8; Lodgment 10; <u>see also</u> <u>Wilson</u>, 584 U.S. at 1192; <u>Ylst</u>, 501 U.S. at 803–04.  The California Court of Appeal found that Petitioner did not establish all elements of a <u>Brady</u> violation.  (<u>See</u> Lodgment 54 at 6–15.)  After considering the withheld DNA evidence, as well as the evidence presented during Petitioner's trial, including Shawver's testimony, surveillance video from Jane Doe's neighbor, holding cell conversations among Petitioner and his co-conspirators, and other DNA evidence, the state appellate court concluded that the withheld evidence was not material under

_____

(emphasis added) (containing Petitioner's "STATEMENT OF PERTINENT FACTS" describing "Ground 1" as "<i>Brady</i> Violation, <u>Counts 11 through 15</u>").)

"A Traverse is not the proper pleading to raise additional grounds for relief."  <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994); <u>see also</u> <u>Collins v. Uribe</u>, 564 F. App'x 343, 343–44 (9th Cir. 2014) (quoting <u>Delgadillo v. Woodford</u>, 527 F.3d 919, 930 n.4 (9th Cir. 2008)) ("Arguments raised for the first time in petitioner's reply brief are deemed waived.").  "In order for the state to be properly advised of additional claims, they should be presented in an amended petition, or . . . in a statement of additional grounds."  <u>Cacoperdo</u>, 37 F.3d at 507.  Nevertheless, as discussed above in note 7, the California Court of Appeal construed Petitioner's <u>Brady</u> violation claim as Petitioner challenging his "convictions for the Doe incident (<u>counts 11 to 15</u>) . . . based on <i>Brady</i> error." (Lodgment 54 at 9 (emphasis added).)  The state appellate court addressed the claim and denied it.  (<u>See</u> <u>id.</u> at 6–15.)  As a result, Plaintiff's <u>Brady</u> violation claim challenging his convictions on counts 11–15 is properly exhausted, and this Court will address the claim with respect to Petitioner's convictions on counts 11–15 in this Report and Recommendation.

1    Brady and that Petitioner received a fair trial.  (Id. at 9.)  In reaching this conclusion, the

2    California Court of Appeal reasoned as follows:

3           On May 31, 2018, following the close of evidence and while the jury
      was deliberating, the prosecutor learned that the crime lab had matched
4     another Black man's DNA to Betsy's wallet.  The prosecutor explained that
      initial testing of the wallet in 2016 revealed a complex mixture of DNA that
5     the crime lab computers could not interpret at that time.  In March 2018, the
      crime lab upgraded their computers which were then able to interpret the
6     results.  The crime lab used the new results to identify A.B., who was an
      African-American male and not one of the seven suspects in the case, as a
7     contributor to the DNA found on the wallet.

8           On May 7, 2018, the Department of Justice sent a letter to Brian B. in
      the San Diego Police Department Forensic Section with the new DNA
9     results showing that DNA belonging to A.B., a Black man, was found inside
      the wallet.  That same day, Brian learned of a family emergency.  Although
10    he attempted to perform his job duties that day, including forwarding the
      new information to the detective in this matter, Brian was emotionally
11    distraught and distracted.  Brian was absent from his work for about one
      month attending to his family emergency.  On May 31, 2018, Brian realized
12    that he had failed to forward the information to the detective.  Brian
      forwarded the information that day and the prosecutor immediately informed
13    the court and defense counsel.

14          A.B. lived within half a mile of the location of the discarded wallet.
      A.B. had prior arrests and convictions for both burglary and robbery.
15    Further investigation failed to yield any connection between A.B. and the
      other individuals in the case.  After the jury returned its verdicts, appellants
16    moved for a new trial based on the prosecution's failure to disclose
      exculpatory evidence as required by Brady.  The prosecutor acknowledged
17    that the prosecution team possessed the potentially favorable new
      information and that it was not disclosed prior to or during trial.  She argued
18    that the evidence was not material and that appellants suffered no prejudice.
      The trial court agreed that the DNA evidence was favorable to the defense,
19    was possessed by the People prior to the start of jury selection and was
      improperly and inadvertently withheld by the People.  It concluded,
20    however, that appellants were not prejudiced by the failure to disclose the
      evidence.  The trial court explained that no evidence connected A.B. to
21    Doe's incident and that "overwhelming" evidence existed regarding
      appellants' guilt as to the Doe incident.

22    . . . .

23

24

25

26

27

28

[A]fter considering the withheld DNA evidence, we conclude that it was not material under *Brady* and that [Petitioner] received a fair trial.

Under *Brady*, supra, 373 U.S. 83, the state is required to disclose to the defense any material, favorable evidence. (*Id.* at p. 87.) "There are three elements to a *Brady* violation: (1) the state withholds evidence, either willfully or inadvertently, (2) the evidence at issue is favorable to the defendant, either because it is exculpatory or impeaching, and (3) the evidence is material." (*People v. Lewis* (2015) 240 Cal.App.4th 257, 263.)

Here, the prosecutor conceded that the first and second elements of a *Brady* violation occurred—the DNA evidence was favorable to the defense and the prosecution withheld the evidence. Accordingly, we focus on the third element, materiality.

"'[S]trictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.'" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*).) A "'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court." (*Id.* at p. 1050.) It is the defendant's burden on appeal to show a reasonable probability—not merely a reasonable possibility—of a different result. (*Strickler v. Greene* (1999) 527 U.S. 263, 291.) The issue is not whether it was more likely than not the defendant would have received a different verdict. (*Smith v. Cain* (2012) 565 U.S. 73, 75.) Instead, we ask if the likelihood of a different result was great enough to undermine confidence in the outcome of the trial. (*Ibid.*) *Brady* claims present a mixed question of law and fact and "are subject to independent review" on appeal, with the trial court's findings of fact, if any, "entitled to great weight when supported by substantial evidence." (*Salazar*, at p. 1042.)

. . . .

Rico did not establish a *Brady* violation

[O]ut of the seven suspects Smith was the only Black man. Thus, even assuming A.B. participated in the crimes against Doe and not Smith, this fact would not have furthered Rico's argument that he was not the fourth person in the home. Shawver's testimony established that Rico did not remain by the car as a lookout. She testified that Rico was one of the four men who left her car and then came running back on the night of Doe's home invasion and sexual assault.

Rico's argument that his DNA was not found inside Doe's home fails to advance his position. The scarf placed over Doe's head contained

Gomez's DNA, but none of the other items tested from Doe's home contained the DNA of any of the other suspects, including Rico.  The DNA expert explained that there are a variety of situations where a person touches an item—for example, while wearing gloves—without leaving DNA.  Notably, Doe testified that the Black man and a man dressed in all black clothing wore gloves.  She also believed that the man in the white hoodie wore gloves, but could not see the hands of the Asian or Hispanic man.

Rico has not shown that the withheld DNA evidence would have put the case against him in such a different light as to undermine confidence in the verdict on the charges against him pertaining to Doe.  (*Salazar*, *supra*, 35 Cal.4th at p. 1050.)

(Id. at 8–10, 13–14.)

In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id., 373 U.S. at 87.  "To establish a Brady violation, the evidence must be (1) favorable to the accused because it is either exculpatory or impeachment material; (2) suppressed by the government, either willfully or inadvertently; and (3) material or prejudicial."  United States v. Blanco, 392 F.3d 382, 387 (9th Cir. 2004).  Suppressed evidence is "material" when "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  Smith v. Cain, 565 U.S. 73, 75 (2012) (quoting Cone v. Bell, 556 U.S. 449, 469–70 (2009)).  A "reasonable probability" means that the likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial."  Id. (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

Petitioner was convicted of conspiracy to commit first degree burglary and robbery (count 11), forcible sexual penetration (count 12), assault with intent to commit forcible sexual penetration during first degree burglary (count 13), first degree robbery in concert (count 14), and first degree burglary (count 15).  (See Lodgment 5 at 1130, 1132–35; Lodgment 6 at 1242–47.)  Petitioner argues that the withheld DNA evidence belonging to A.B. was material under Brady, and that it would have led to a different verdict.  (See

ECF No. 1-2 at 18–21, 23, 37; see also ECF No. 15 at 14.)  The California Court of Appeal determined that the evidence was not material because there was no reasonable probability that the result would have been different had the evidence been timely disclosed, and that Petitioner did not establish the third element required to establish a Brady claim violation.  (See Lodgment 54 at 14–15.)  The voluminous record in this case contains substantial evidence supporting the state appellate court's conclusion.

### 1. Jane Doe's testimony

Jane Doe testified during Petitioner's trial that on the night of January 31, 2016, she was in her house with her three children aged eight, six, and four, while her husband was out of town for the weekend.  (Lodgment 9 at 2779–80.)  She woke up around 2:15 a.m., saw flashlights coming from the stairwell, and heard footsteps, followed by a male voice directing her to "get down and be quiet."  (Id. at 2782–84.)  She was not wearing her contact lenses or glasses, and could clearly see about a foot or foot-and-a-half in front of her.  (Id. at 2781.)  Jane Doe pulled the blanket over her head and heard several intruders enter her bedroom.  (Id. at 2785–86, 2799.)  She told the intruders that her money and jewelry were in the closet, that she had three small children, and asked the intruders not to go into her children's bedrooms.  (Id. at 2787–88.)

Jane Doe further testified that one intruder rummaged through her closet and found jewelry, and he was wearing black hoodie, pants, and gloves, and was Hispanic or Asian.  (Id. at 2789–92, 2805, 2811.)  Another intruder in a white hoodie and black pants held up Jane Doe's van keys and stated that because she had kids, the intruders would not take the keys.  (Id. at 2794–95, 2805, 2811.)  Subsequently, another intruder commanded Jane Doe to "pull back the covers," because "[he] want[ed] to see what [she] look[ed] like."  (Id. at 2807–08, 2810–11, 2813.)  Jane Doe noticed that the intruder wore thick dark-rimmed glasses, a dark bandana around the bottom half of his face, that he had a round face, and was Hispanic or Asian.  (Id. at 2808.)  The fourth intruder then tied Jane Doe with shoelaces.  (Id. at 2810–11.)  When the intruder was tying Jane Doe's hands, he was

"pretty close," and Jane Doe saw that he was a black man and that he was wearing a dark hoodie.  (Id. at 2812.)

The black man subsequently commanded Jane Doe to take off her clothes.  (Id. at 2827–28.)  He cut off the shoelace tied around Jane Doe's wrists, pulled the scarf down around her neck so that she could see, and she stood up and undressed.  (Id. at 2828–29, 2831.)  Jane Doe testified that she was looking down and could see three sets of legs next to her bed, but there might have been a fourth person standing further away from the bed.  (Id. at 2832–33, 2858.)  The black man tied her hands together with another shoelace and someone else put a pillowcase over her head.  (Id. at 2839–40, 2842–47.)  When she attempted to protest, the man in the white hoodie pressed a gun against her arm and told her to "[b]e quiet and do what we say."  (Id. at 2846–47, 2857.)  Jane Doe then described in detail how she was assaulted.  (Id. at 2832–38.)  She testified that one of the men put two fingers inside her vagina, and that although she did not know who sexually assaulted her, based on the intruders' locations in her bedroom, she "assume[d] it was the black guy."  (Id. at 2849.)

The black man then instructed Jane Doe to take a shower, the man in glasses guided her the shower, the man in the black hoodie handed her a washcloth, and someone took the pillowcase, scarf, and tank top off her, but her hands were still bound by the shoelace.  (Id. at 2857, 2859.)  The men watched her shower and left.  (Id. at 2860–62.)  Jane Doe stated that the intruders were in her house between thirty and forty-five minutes.  (Id. at 2863.)

Jane Doe also testified that the black man appeared to be in his twenties or thirties, about 5'10," average build, and his complexion was a medium shade of black.  (Id. at 2867–69.)  He was taller than the other intruders and wore black clothing and black gloves with grey tips.  (Id. at 2868.)  The man in glasses wore thick black framed black glasses, had round face, wore dark clothing, and was Asian or Hispanic.  (Id. at 2869–71.)  The man in the black hoodie was "short, around 5'6," and appeared to be Hispanic.  (Id. at 2871.)  Jane Doe further testified that she did not see the skin color of the man in

the white hoodie, but his height appeared to be in between the black man's height and that of the man in the black hoodie.  (Id. at 2872–73.)  Jane Doe testified that the intruders took her gold necklace, a wedding band, an engagement ring, two gold and diamond rings, a watch, a camera and related equipment, a Bluetooth speaker, iPad, iPod, cash, and a duffle bag containing a thumb drive with family pictures from Disney World.  (Id. at 2874–77.)

## 2. Robin Shawver's testimony

Robin Shawver testified during Petitioner's trial that she had been arrested on February 17, 2016, and subsequently pled guilty to conspiracy, robbery and burglary concerning the crimes that occurred on January 31, 2016, and involved Jane Doe.  (Lodgment 35 at 4116–18.)  Shawver was serving a three-year sentence at the time she was subpoenaed to testify at Petitioner's trial.  (Id. at 4116, 4119–21.)

Shawver testified that she had met Petitioner's brother, Rico V, several months before her arrest and was dating Rico V.  (Id. at 4123–24.)  She stated that Smith was friends with the Rico brothers and spent time with them every week.  (Id. at 4125.)  Additionally, Shawver stated that she had known Gomez for a long time and was good friends with him, and Gomez was also friends with the Rico brothers and Smith.  (Id. at 4126.)  Shawver met Harvey through the other men.  (Id. at 4127.)

Shawver further testified that Gomez frequently asked to borrow her white Nissan, and she allowed it while she was at work during the day, and, on several occasions, at night.  (Id. at 4129–30, 4133.)  She always asked Gomez to inform her who he was with while driving her car.  (Id. at 4130, 4133.)  She stated that in January and February 2016, Gomez borrowed her car two-to-three times per week, and, sometimes, he was with Smith and Petitioner while driving Shawver's car.  (Id. at 4132–33.)

Shawver testified that on January 31, 2016, Gomez, Petitioner, Rico V, and Smith picked her up from work in her car, and she was drinking and smoking marijuana.  (Id. at 4133.)  Shawver also stated that no one else joined them that night.  (Id. at 4133–34.)  Gomez drove Shawver's car, and Rico V and Shawver were passengers.  (Id. at 4133,

4135.)  Petitioner and Smith drove Harvey's car, although Harvey was not present that night.  (Id. at 4135.)

Shawver fell asleep and was awakened when both cars were parked in Jane Doe's neighborhood, and Petitioner, Gomez, Rico V, and Smith got out of the cars.  (Id. at 4136–37, 4154.)  Shawver was wearing a black hoodie and one of the men asked to trade sweatshirts with her.  (Id. at 4137.)  The four men left, and she stayed in the car, trying to go back to sleep.  (Id. at 4137–38.)  She was not able to sleep, and was texting a friend between 1:30 a.m. and 3:00 a.m.  (Id. at 4138, 4155.)

Shawver further testified that about an hour later, Petitioner, Gomez, Rico V, and Smith ran back to her car from the same direction, jumped in, and Gomez drove away.  (Id. at 4138–39, 4164.)  Harvey's car was left parked in Jane Doe's neighborhood.  (Id. at 4139.)  The four men appeared to be "tense."  (Id. at 4139, 4142, 4163.)  While they were driving, one of the men asked Shawver to search for breaking news stories regarding the home invasion robbery that had occurred that morning.  (Id. at 4142–43, 4162.)  Shawver, Petitioner, Gomez, Rico V, and Smith went to a motel in Escondido.  (Id. at 4156.)

### 3.  Video recording from Jane Doe's neighbor's security cameras

Jane Doe's neighbor's security cameras recorded two cars[10] entering the neighborhood at 12:59 a.m. on January 31, 2016.  (Lodgment 9 at 2907–08, 2912.)  At 2:09 a.m., two individuals wearing hoodies and white sneakers were recorded rummaging through the neighbor's unlocked truck.  (Id. at 2913–14.)  Shortly thereafter, two individuals walked towards Jane Doe's house from the direction where the cars had entered the neighborhood.  (Id. at 2915.)  At 2:48 a.m., the cameras recorded four people running away from Jane Doe's house in the direction of the two parked cars.  (Id. at 2909,

---

[10]  After analyzing the video, John Smith, a police detective for the City of San Diego concluded that one of the suspect's cars was an older model white Nissan or Toyota, and the other car was a grey or silver Volkswagen.  (Lodgment 38 at 5080, 5096–99.)

2916.)  One individual was wearing light-colored pants and a dark top, another individual—dark pants with a lighter colored jacket or shirt, and two individuals were wearing light tops and dark pants.  (Id. at 2917, 3012–15, 3018–19.)  At 2:49 a.m., the cameras recorded a car driving away from that location.  (Id. at 2909.)

### 4. Holding cell conversations

After the suspects of crimes at issue in this case were arrested, they were placed in the same holding cell (at different times), and their conversations were recorded. (Lodgment 16 at 5163–65.)  Gomez and Smith specifically referenced the assault committed against Jane Doe in her Sorrento Valley home:

> SMITH:  They don't have any evidence, bro.  What, what—what type of evidence do they have?  They have to find the shit on you bro.
> GOMEZ:  Well that's funny 'cause they described us from the Valley incident too.
> SMITH:  What did they say?
> GOMEZ:  Very detailed.
> SMITH:  What did they say?
> GOMES:  And they put it down as if I had said it.
> SMITH:  What did they say?
> GOMEZ:  Exactly what happened.
> SMITH:  What happened?  What'd they say?
> GOMEZ:  The whole finger incident and her in the shower.
> SMITH:  Ah, that's it?

(Lodgment 4 at 858–59 (emphases added)).

Smith then commented on the video recording from Jane Doe's neighbor that showed two cars in the neighborhood by stating the following:  "I don't get it though. How—if there's no fucking description—That's what I don't get.  Hey in the video, can you see the faces or no [?]"  (Id. at 859.)  Shawver and Smith then had the following conversation regarding the video:

> SMITH:  Yeah but you say—you seen the video, right?
> SHAWVER:  No it didn't show faces.
> SMITH:  What did you see, just the running part or what?
> SHAWVER:  My car.

22cv701-AGS(LR)

SMITH:  Oh that was there?
SHAWVER:  Mm-hmm.  <u>Mine and [Harvey's]</u>.

(<u>Id.</u> (emphases added).)

Notably, during a subsequent holding cell conversation, Shawver told Petitioner that "[l]iterally ten minutes after Sorrento Valley, you see breaking news being searched up on my phone."  (<u>Id.</u> at 861.)  Petitioner then replied, "Oh you looked stuff up like that?"  (<u>Id.</u>)

Later, Petitioner told Gomez that "[Shawver]'s gonna tell on us."  (<u>Id.</u> at 862.)  After Gomez appeared to agree, Petitioner stated that "it's her word against all of ours."  (<u>Id.</u>)

### 5. Cell phone evidence

Don Holmes, an investigator with the San Diego District Attorney's Office, testified at Petitioner's trial.  (Lodgment 37 at 4733–4845.)  He stated that he specialized on "analyzing and mapping historical call detail records."  (<u>Id.</u> at 4735.)  He testified that on January 31, 2016, Shawver and Smith's cell phones connected to cell towers that were near each other at 12:44 a.m. in the UTC La Jolla area, approximately four to five miles from Jane Doe's house.  (<u>Id.</u> at 4808–11.)  Between 1:10 a.m. and 1:30 a.m., Shawver's phone connected multiple times to a tower over one mile away from the crime scene and from the sector of the tower facing the crime scene, and cell tower information showed Shawver texting during that time period.  (<u>Id.</u> at 4810–11.)

At 3:14 a.m., Smith's cell phone connected to a tower in Mira Mesa, and at 3:14 a.m. and 3:17 a.m., Gomez's phone connected to the same cell tower as Smith's.  (<u>Id.</u> at 4811–12.)  Gomez and Smith called each other at 3:17 a.m. and 3:19 a.m., and their phones connected to the same tower.  (<u>Id.</u> at 4812–13.)  At 3:21 a.m. and 3:22 a.m., Smith and Gomez's cell phones connected to the same cell tower one mile away from the previous tower.  (<u>Id.</u> at 4813.)

Petitioner's phone was not active at around the time Jane Doe crimes were committed on January 31, 2016.  (<u>Id.</u> at 4808–14.)  Later that morning, Petitioner

received a message from Harvey asking if he was going to the "P shop," and a message from Shawver asking to "keep [her] car safe." (Id. at 4901–02.)

### 6. Evidence recovered from Shawver's and Harvey's cars

Troy Brown, a police officer for the City of San Diego, and John Smith, a police detective for the City of San Diego, testified at Petitioner's trial. (Lodgment 34 at 3814–45; Lodgment 38 at 5080–5188.) Brown and Smith testified that on February 17, 2016, Petitioner, Gomez, and Harvey were stopped by officers in Harvey's car. (Lodgment 34 at 3820–24; Lodgment 38 at 5122, 5125–26.) Officers found zip ties, backpacks with changes of clothing, gaming consoles, and games. (Lodgment 34 at 3824–27; Lodgment 38 at 5126–27.) Petitioner had $1,300 cash in his wallet. (Lodgment 34 at 3833, 3855; Lodgment 38 at 5127.)

Officers also observed Smith and Shawver getting gas for Shawver's car. (Lodgment 34 at 3837–39; Lodgment 38 at 5130.) Smith had a flashlight and gloves in his pocket and attempted to throw away a giraffe-shaped piggy bank before officers approached him. (Lodgment 34 at 3838–40, 3845; Lodgment 38 at 5130–32.) Officers also found a thumb drive with family photos from Disney World stolen from Jane Doe's residence, several bandanas and hoodies, and video games in Shawver's car. (Lodgment 34 at 3841–45; Lodgment 38 at 5130–32.)

### 7. DNA evidence

Marybeth Sciarretta, a criminalist in the forensic science department at the San Diego Police Department, testified at Petitioner's trial. (Lodgment 36 at 4539–4614; Lodgment 37 at 4705–33.) She testified that Gomez's DNA was found on a scarf that was used to cover Jane Doe's eyes at the crime scene on January 31, 2016, but none of the other suspects' DNA was found at the Jane Doe crime scene. (Lodgment 36 at 4589–90.) Smith's DNA was found on shoelaces used to tie up Betsy at the February 5, 2016 crime scene, but no DNA from the other suspects was found at that crime scene. (Id. at 4591.) Additionally, Smith's DNA was found on crime scenes on each night with the exception of January 11, 2016. (Id. at 4567, 4569–70, 4575, 4578–80, 4590–95.)

Further, Michael J.'s[11] DNA was found inside Betsy's wallet.  (Lodgment 37 at 4729–30.)

**8.  The trial court's denial of Petitioner's motion for a new trial based on the alleged <u>Brady</u> violation**

The trial court found that the DNA evidence belonging to A.B. "could be considered exculpatory" and that the evidence was "inadvertently" withheld by the State.  (Lodgment 44 at 7031.)  The trial court then turned to the "key issue" of whether the withheld evidence was material or prejudicial, and found that it was not, reasoning as follows:

> [T]his DNA was found on an item from a burglary five days after the Jane Doe incident.  We'd be in a very different situation if this was evidence directly tied in to the night of the Jane Doe incident or something obviously inside the Jane Doe residence of course, we'd be in a very different posture.
> And then we've got the fact that this person identified by the CODIS hit.  Again, we have surveillance, cell phone evidence, extensive evidence in this case.  There is not one scintilla of evidence to show that this 37-year-old black man had any connection whatsoever to anyone in this case.  These defendants, a lot of them told a lot of information to law enforcement.  Robin Shawver, Mr. Gomez, Mr. Rico, we have a lot.  We have holding cell conversations, extensive.  There is not one scintilla of information tying this man to any of these defendants or anything whatsoever to do with any of these crimes.  So that I think would have easily allowed the DA to say this is a total red herring.
> . . . .
> As to Mr. Rico, I don't understand how this provides any help whatsoever to Mr. Rico.  I just—obviously, for the record, Mr. Rico is not an African-American man.  Again, I just don't see that, in analyzing this in the case against Mr. Rico that this would help him at all.  I think it would be of no import to the jury whatsoever in analyzing Mr. Rico's case.  So I deny the motion for a new trial as to Mr. Rico[.]

(<u>Id.</u> at 7031–32, 7036.)

---

[11]  Michael J. testified at Petitioner's trial that he discovered the wallet on a street in Mira Mesa on February 5, 2016, and turned the wallet into police.  (Lodgment 32 at 3119–21.)

22cv701-AGS(LR)

### 9.  Conclusion

As outlined in detail above, during Petitioner's trial, the jury heard Jane Doe's testimony that there were four male perpetrators in her house on January 31, 2016, and that they entered her house at around 2:15 a.m., and left between thirty-to-forty-five minutes later.  (See Lodgment 9 at 2782–84, 2863.)  Further, the jury heard Shawver's testimony that on January 31, 2016, she was with Petitioner, Smith, Gomez, and Rico V, and observed them drive to Jane Doe's neighborhood, park, leave the cars, and subsequently run back to Shawver's car.  (See Lodgment 35 at 4133–39, 4154, 4164.) Shawver also testified that she stayed in her car and was texting with a friend while the four men were gone, that no one else joined their group that night, and that no one else was with her in the car in Jane Doe's neighborhood while she waited for Petitioner, Smith, Gomez, and Rico V to return.  (Id. at 4133–34, 4137–38.)

Further, the jurors saw video recordings from Jane Doe's neighbor's security camera showing that on January 31, 2016, the same models of cars as driven by Shawver and Harvey entered Jane Doe's neighborhood at around 12:59 a.m., and four people running from the direction of Jane Doe's house in the direction of the two parked cars at around 2:48 a.m.  (See Lodgment 9 at 2902–19; Lodgment 38 at 5096–99.)  Additionally, cell phone tower evidence presented to the jury showed that Shawver, Gomez, and Smith were together immediately before and after the crimes at Jane Doe's house were committed.  (Lodgment 37 at 4808–913.)  The evidence recovered from Shawver's car, that included a thumb drive with Jane Doe's family photos from Disney World, which was stolen from her house on January 31, 2016, was also presented to the jury.  (See Lodgment 34 at 3841–45; Lodgment 38 at 5130–32.)  The jury was presented the evidence of holding cell conversations among Petitioner, Shawver, Gomez and Smith, that specifically referenced "Valley incident" and the "finger incident and [the victim] in the shower," and the evidence regarding the items seized from Shawver's and Harvey's cars, including gloves, bandanas, and the thumb drive with Jane Doe's Disney World

family photos.  (See Lodgment 4 at 858–59; Lodgment 16 at 5163–65; Lodgment 34 at 3824–27, 3833, 3838–45, 3855; Lodgment 38 at 5126–27, 5130–32.)

The withheld DNA evidence belonging to A.B. was found on a wallet stolen during a different burglary, which occurred five days after the crimes committed at Jane Doe's house on January 31, 2016.  Further, the wallet was found on a public street in a highly populated area.  (See Lodgment 37 at 4729–30.)  Notably, A.B.'s DNA was not found at the crime scene at Jane Doe's house, and there was no evidence connecting A.B. to any of the crimes or suspects in this case.  (See Lodgment 32 at 3199–21.)  The DNA evidence at issue therefore was not material within the meaning of Brady.  See Brady, 373 U.S. at 87; Smith, 565 U.S. at 75.  Further, the cumulative effect of the evidence presented at Petitioner's trial, including the evidence enumerated above, likely had a larger impact on the jury with respect to Petitioner's guilt than the withheld DNA evidence would have had given the volume of the other evidence.  See Barker v. Fleming, 423 F.3d 1085, 1099 (9th Cir. 2005) (citing Kyles, 514 U.S. at 437) (providing that "materiality analysis is not complete until we consider the cumulative effect of the suppressed evidence").  Here, even after considering its cumulative effect, the suppressed evidence would not create a reasonable probability that Petitioner would have gotten a different result with regard to the Jane Doe charges.  See id.; U.S. v. Agurs, 427 U.S. 97, 109–10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

Although Petitioner argues that the DNA evidence at issue "would have added to the force of the cross-examination and defense counsel's closing argument," (ECF No. 1-2 at 18–21; ECF No. 15 at 14), it is unlikely that the evidence would have caused the jury to question Jane Doe's testimony.  As discussed above, Jane Doe testified that there were four male perpetrators inside her house, the video from Jane Doe's neighbor's security cameras showed four people running away from the direction of Jane Doe's house in the direction of the two parked cars, Shawver testified that Petitioner was one of the four men

who ran back to her car; and there was no evidence presented during Petitioner's trial indicating that he was the lookout during the commission of the crimes he was charged with.  Further, Petitioner's trial counsel argued during his closing arguments that Petitioner was the lookout during the commission of the crimes at Jane Doe's house, and that Petitioner did not aid and abet the sexual assault; however, the jury rejected these arguments and convicted Petitioner of all charged crimes.  (See Lodgment 41 at 6035–37, 6049, 6059, 6062–63; Lodgment 6 at 1242–47.)  Therefore, after consideration of the substantial evidence presented during Petitioner's trial, it is not probable that the DNA evidence from another individual found on a wallet stolen during a burglary five days after the Jane Doe crimes were committed would have changed the jury's decision to reject defense counsel's argument.

For all the reasons stated above, the Court finds that the state court's rejection of Petitioner's Brady claim was not contrary to, or an unreasonable application of, any clearly established law, nor did it involve an unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C. § 2254(d). The Court therefore **RECOMMENDS** that Petitioner's Brady violation claim be **DENIED.**

**B.** **Habeas Relief is not Warranted with Respect to Petitioner's Claim that there was Insufficient Evidence to Support his Robbery Convictions on Counts 10 and 24**

Petitioner alleges that there was insufficient evidence to support his robbery convictions pertaining to N.P. (count 10) and John Doe (count 24).  (ECF No. 1 at 7; ECF No. 1-2 at 23–37; ECF No. 15 at 14–18.)  He argues that during the events at issue, N.P. and John Doe hid in their bedrooms, and at most witnessed robberies being committed against their parents.  (ECF No. 1-2 at 25–26; ECF No. 15 at 16–18.)  Petitioner asserts that no force or fear was applied to either N.P. or John Doe to accomplish the takings at issue.  (ECF No. 1-2 at 33–34; ECF No. 15 at 16.)  Petitioner further contends that N.P. and John Doe did not have any possessory interest or right to possess the property taken from their respective homes.  (ECF No. 1-2 at 34, 36–37.)  Petitioner also maintains that

the "family owned" property theory is not valid under California law.  (Id. at 36; ECF No. 15 at 17.)

Respondents argue that there was sufficient evidence to support Petitioner's robbery convictions on counts 10 and 24  because the circumstances of the robberies produced fear in both N.P. and John Doe, and N.P. and John Doe constructively possessed the property stolen from their houses.  (ECF No. 10-1 at 12–13.)  Respondents also contend that the state court reasonably and properly applied the governing law regarding evidentiary sufficiency, and there is no basis to grant the relief Petitioner seeks in claim two.  (Id.)

Because the California Supreme Court summarily denied Petitioner's petition (Lodgment 10), the Court must "look through" the silent denial to the California Court of Appeal's opinion (Lodgment 8).  See Wilson, 584 U.S. at 1192; Ylst, 501 U.S. at 803–04.  The California Court of Appeal found that substantial evidence supported Petitioner's robbery conviction on counts 10 and 24.  (See Lodgment 54 at 16–24.)  Specifically, the state appellate court reasoned as follows:

> To determine the sufficiency of the evidence, "we review the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.)  We must "view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Lewis* (1990) 50 Cal.3d 262, 277.)  It is not our function to reweigh the evidence (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), and reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding.  (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)  Reversal of a conviction for insufficient evidence is only required if under no hypothesis whatever is there substantial evidence to support the conviction.  (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)
>
> The elements of robbery are (1) the taking of personal property (2) from a person or the person's immediate presence (3) by means of force or fear and (4) with the intent to permanently deprive the person of the property.  (§ 211; *People v. Marshall* (1997) 15 Cal.4th 1, 34.)  "The fear

mentioned in Section 211 may be either: [¶] 1. The fear of an unlawful injury to the person or property of the person robbed, or of any relative of his or member of his family; or, [¶] 2. The fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed at the time of the robbery." (§ 212.)

"Fear may be inferred from the circumstances in which a crime is committed or property is taken." (*People v. Holt* (1997) 15 Cal.4th 619, 690.)  The victim's fear need not be extreme.  (*People v. Davison* (1995) 32 Cal.App.4th 206, 216.)  "[T]he requisite force or fear need not occur at the time of the initial taking.  The use of force or fear to escape or otherwise retain even temporary possession of the property constitutes robbery." (*People v. Flynn* (2000) 77 Cal.App.4th 766, 772.)  "So long as the perpetrator uses the victim's fear to accomplish the retention of the property, it makes no difference whether the fear is generated by the perpetrator's specific words or actions designed to frighten, or by the circumstances surrounding the taking itself." (*Ibid.*)  Whether force or fear exists is a question for the trier of fact. (*People v. Mungia* (1991) 234 Cal.App.3d 1703, 1707.)

"[N]either ownership nor physical possession is required to establish the element of possession for the purposes of the robbery statute. [Citations.]  '[T]he theory of constructive possession has been used to expand the concept of possession to include employees and others as robbery victims.'  [Citation.]  Two or more persons may be in joint constructive possession of a single item of personal property, and multiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken." (*People v. Scott* (2009) 45 Cal.4th 743, 749-750 (*Scott*).)

a.  The takings were accomplished by force or fear
The evidence supported the jury's implied finding that the requisite force or fear existed as to both M.N. and John Doe.  The trial court instructed the jury with CALCRIM No. 1600 on robbery.  The instruction informed the jury that, to support a robbery conviction, the People were required to prove, beyond a reasonable doubt, that the "defendant used force or fear to take the property or to prevent the person from resisting . . . ." (CALCRIM No. 1600.)  The instruction further informed the jury that "[f]ear, as used here, means fear of injury to the person himself or herself, or injury to the person's family or property."  (CALCRIM No. 1600, italics deleted; § 212.)

Turning first to M.N., the evidence shows that one of the intruders tried to enter her room, but was thwarted by her locked door.  After M.N.

opened her door, she observed her father sitting on the stairs at gunpoint with his head covered and hands behind his back telling one of the men that he had no money.  M.N. ran to her bedroom and locked the door after one of the intruders saw her and told her to stop.  M.N. was scared because the man was about six to 10 feet away from her and carried a gun.  The circumstances of the robbery reasonably produced fear in M.N. for her own safety, and that of her father.

Similarly, during the robbery at John Doe's home, John Doe looked downstairs and saw his father lying face down on the floor.  A man stood over his father's head holding a gun.  John Doe felt scared and confused.  After John Doe returned to his bedroom to hide, he saw a person run by his open door.  John Doe saw the man try to force his way into his brother's bedroom where his mother and brother hid.  This man also held a gun.  During this entire time, John Doe's mother was screaming.  These circumstances reasonably produced fear in John Doe for the safety of his father, mother and brother.

In both robberies, the force applied to the victim's family members and the fear caused by the robbers' actions, allowed the robbers to accomplish the taking and escape with the property.  (See *People v. Prieto* (1993) 15 Cal.App.4th 210, 211, 215–216 [substantial evidence that appellant's forceful taking of purses of two victims—one of whom held the purses in her lap, and the other of whom witnessed the act from a distance and yelled at appellant to stop—supported two counts of robbery; victim who witnessed robbery from a distance was "fearful and shocked" and thus "less inclined or able than she otherwise would have been to prevent appellant from taking her purse"].)  Thus, we conclude, that M.N. and John Doe were robbery victims.

b.  These family members constructively possessed the stolen property under the special relationship doctrine

Rico notes that the property taken from M.N.'s home consisted of her mother's purse and items taken from her parents' closet.  He argues that M.N. was not in the master bedroom, nor did she have any possessory interest in the stolen property.  In the John Doe robbery, the men took Thomas's wallet, cell phone and tablet reader, Gina's purses and a bag of quarters.  Rico similarly contends that John Doe was not near the stolen property, nor did he have the right to possess this property.  He asserts that we should decline to follow *People v. Hutchinson* (2018) 20 Cal.App.5th 539 (*Hutchinson*), a case applying the concepts of robbery to a child in a home with her parents.  Rico expresses doubt whether California law recognizes family-owned property.  Even if this theory is valid, he contends

*Hutchinson* is distinguishable because M.N. and John Doe were not subjected to any force or fear, and an item had been stolen from the child in *Hutchinson*.

Any person who owns or who exercises direct physical control over, or who has constructive possession of, any property taken may be a victim of a robbery if force or fear is applied to such person. (*Scott*, *supra*, 45 Cal.4th at pp. 749–750.) "For constructive possession, courts have required that the alleged victim of a robbery have a 'special relationship' with the owner of the property such that the victim had authority or responsibility to protect the stolen property on behalf of the owner." (*Id.* at p. 750.) "By requiring that the victim of a robbery have possession of the property taken, the Legislature has included as victims those persons who, because of their relationship to the property or its owner, have the right to resist the taking, and has excluded as victims those bystanders who have no greater interest in the property than any other member of the general population." (*Id.* at pp. 757–758.)

Civil Code section 50 establishes the right to use "necessary force" to protect the "property of oneself, or of a spouse, child, parent, or other relative, or member of one's family." "Two or more persons may be in joint constructive possession of a single item of personal property, and multiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken." (*Scott*, *supra*, 45 Cal.4th at p. 750.) Accordingly, the single taking of property, by force or fear, from the joint possession of more than one victim will support multiple robbery convictions. (*People v. Ramos* (1982) 30 Cal.3d 553, 587 (*Ramos*), reversed in part on other grounds in *California v. Ramos* (1983) 463 U.S. 992.)

*Hutchinson* is a case applying the concepts of robbery to a child present in a home with her parents and other family members at the time of the home invasion. (*Hutchinson*, *supra*, 20 Cal.App.5th at pp. 543–545, 549.) Although the *Hutchinson* court observed that the child's watch had been stolen, it concluded that the child had constructive possession of the property stolen from the family based on the family relationship. (*Id.* at p. 549.) The *Hutchinson* court found "no rational basis to conclude that a minor's constructive possession of or possessory interest in her family's property is nonexistent if majority members of her family are present. . . . The forcible taking of family-owned (parents or siblings) property impacts both children and adults within a family unit." (*Ibid.*)[12]

---

[12]  Notably, the California Jury Instructions, Criminal (CALJIC) created a new instruction based on *Hutchinson*, *supra*, 20 Cal.App.5th 539, which provides: "Robbery requires among other things that the victim be in possession of the property stolen.  There are two kinds of possession: actual possession and

Applying these principles here, the evidence supports the jury's robbery finding as to both M.N. and John Doe, who were household family members at the time of the home invasions.  Civil Code section 50 establishes the right to use "necessary force" to protect the property of oneself, a parent or other relative.  Under this statute, M.N. and John Doe had the authority to protect the stolen property, and thus had constructive possession of it.  Both family members tried to protect the property in the home by calling 911.  We agree with *Hutchinson*, *supra*, 20 Cal.App.5th at p. 549, that the presence of M.N.'s and John Doe's parents did not divest these family members of their statutory authority to protect, or their constructive possession of, their parent's property.  Where, as here, force or fear is applied to multiple victims in joint possession of property, multiple robbery convictions are proper.  (*Scott*, *supra*, 45 Cal.4th at pp. 749–750; *Ramos*, *supra*, 30 Cal.3d at p. 589.)  In summary, viewing the record in the light most favorable to the prosecution, we conclude that the evidence supports Rico's robbery convictions as to M.N. and John Doe.

(Id. at 18–24 (footnote in the original, footnote numbering changed).)

The clearly established federal law regarding sufficiency of the evidence claims is set forth in Jackson v. Virginia, 443 U.S. 307 (1979).  See id.; Cavazos v. Smith, 565 U.S. 1, 7 (2011) (per curiam).  Petitioner is entitled to federal habeas corpus relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  Jackson, 443 U.S. at 324.  "The Jackson standard 'must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.'"  Chein v. Shumsky, 373 F.3d 978, 983 (9th

---

constructive possession.  Actual possession requires that a person knowingly exercise direct physical control over a thing.  [¶]  Constructive possession does not require actual possession, but does require that a person knowingly exercise control over or the right to control a thing, either directly or through another person or persons.  [¶]  [Two or more persons may be in joint constructive possession of a single item of personal property, and multiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken.]  [¶]  Constructive possession only requires that there be some type of special relationship with the owner of the property sufficient to demonstrate the victim had authority or responsibility to protect the stolen property on behalf of the owner.  The victim need not have general authority to control the owner's property in other circumstances.  [A special relationship may include close relatives, regardless of age, who live in the same household or who visit frequently.]"  (CALJIC No. 9.40.4 (2020 ed.) pp. 971–972.)

Cir. 2004) (en banc) (quoting <u>Jackson</u>, 443 U.S. at 324 n.16); <u>see also</u> <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1275 (9th Cir. 2005) ("Although our sufficiency of the evidence review is grounded in the Fourteenth Amendment, we undertake the inquiry with reference to the elements of the criminal offense as set forth by state law.").

"<u>Jackson</u> claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." <u>Coleman v. Johnson</u>, 566 U.S. 650, 651 (2012). First, on direct appeal, a "reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." <u>Id.</u> (citation omitted). Second, on habeas review, a federal court may overturn a state court decision rejecting a sufficiency of the evidence challenge "only if the state court decision was 'objectively unreasonable,'" but may not do so simply because the federal court disagrees with the state court. <u>Id.</u> (citation omitted).

"[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." <u>Cavazos</u>, 565 U.S. at 2; <u>see also</u> <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995) (habeas courts must respect "the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict."). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Jackson</u>, 443 U.S. at 326.

Petitioner was convicted of robbery in count 10 (victim M.N.) and count 24 (victim John Doe). (<u>See</u> Lodgment 5 at 1133–34.) The trial court instructed the jury on the elements of the crime as follows:

> To prove that a defendant is guilty of [robbery in violation of Penal Code section 211], the People must prove that:
>
> 1. The defendant took property that was not his own;
> 2. <u>The property was in the possession of another person</u>;

      3.  The property was taken from the other person or his immediate presence;

      4.  The property was taken against that person's will;

      5.  <u>The defendant used force or fear to take the property or to prevent the person from resisting</u>; AND

      6.  When the defendant used force or fear, he intended to deprive the owner of the property permanently.

. . . .

Two or more people may possess something at the same time.

A person does not have to actually hold or touch something to possess it.  It is enough if the person has control over it or the right to control it, either personally or through another person.

*Fear*, as used here, means fear of injury to the person himself or herself, or injury to the person's family or property.

Property is within a person's *immediate presence* if it is sufficiently within his or her physical control that he or she could keep possession of it if not prevented by force or fear.

(Lodgment 7 at 1536–37 (emphases added)); <u>see also</u> CALCRIM No. 1600.  Petitioner argues that the evidence presented at his trial was not sufficient to support the finding with respect to the second and fifth elements of the crime of robbery with respect to M.N. (count 10) and John Doe (count 24)—that M.N. and John Doe had a possessory interest in the property taken, and that force or fear was applied to M.N. and John Doe to accomplish the takings at issue.  (<u>See</u> ECF No. 1 at 7; ECF No. 1-2 at 23–37.)

## 1.  Relevant Evidence (M.N.)

During Petitioner's trial, M.N. testified that in January 2016, she lived in a house with her parents, brother (who was not at the house on the night of the robbery), and her two children aged nine and seven.  (Lodgment 31 at 2734.)  M.N. and her two children slept in a bedroom upstairs and had their door locked.  (<u>Id.</u> at 2735.)  M.N. further testified that on January 29, 2016, at about 1:30 a.m., she heard the door knob to her

bedroom "jiggle," like someone was trying to get inside.  (Id. at 2735–36.)  She subsequently opened the bedroom door and saw her father downstairs with something covering his face, "tied up with a gun pointed at him" by a masked intruder.  (Id. at 2738–39.)  M.N. overheard her father telling the intruder that he was retired and did not have any money.  (Id. at 2739.)  M.N. testified that after seeing her father, she was scared and did not know what to do.  (Id.)  She then saw another intruder coming out of her brother's bedroom with a gun in his hands, about six-to-ten feet away from her, and the intruder told M.N. to stop.  (Id. at 2740–41, 2746.)  M.N. ran back to her bedroom and locked the door.  (Id. at 2741.)  She testified that she was scared, and that she woke up her children and told them to hide under the table in their bedroom.  (Id. at 2741–42, 2745.)  M.N. dialed 911 and reported the crime.  (Id. at 2742.)

M.N.'s mother testified that on January 29, 2016, she was asleep in her bedroom with her husband, and was awakened by three intruders, who demanded money, gold, and jewelry.  (Lodgment 30 at 2504, 2510, 2513.)  The intruders told her that they would shoot her and her husband if she called the police.  (Id. at 2520–21.)  The intruders took gold bars hidden in the master closet, approximately a thousand dollars in cash stored in her purse, and jewelry from the drawers of the master bedroom.  (Id. at 2522, 2534–35.)

M.N.'s father testified that a masked intruder pointed a gun at him, tied him up with cords, and put a piece of clothing over his head.  (Id. at 2566–67.)  The intruder then took M.N.'s father downstairs, sat him at the last step of the stairs, and "at all times [the intruder] was pointing the gun at [M.N.'s father]."  (Id. at 2568.)  M.N.'s father heard the intruders trying to open his daughter's door upstairs, and, at one point, heard the door opening and then shutting.  (Id. at 2570.)  M.N.'s farther also stated that the intruders took forty dollars from his wallet, and four watches from drawers of the master bedroom.  (Id. at 2561–62.)

### 2.  Relevant Evidence (John Doe)

John Doe testified during Petitioner's trial that on February 11, 2016, he was thirteen, and lived in a house with his parents and his younger brother.  (Lodgment 33 at

3495–97.)  At around 2:45 a.m. he woke up because he heard his dog barking, loud footsteps, his "dad yelling," and his mother yelling to call the police.  (Id. at 3498–3500.) John Doe saw bright LED lights "moving around franticly," called the police, but then hung up because he heard his mother on the phone with the police.  (Id. at 3501–02.)  He exited his bedroom and saw his father downstairs on the ground, with his face down, and a "man standing over [his father's] head with a gun."  (Id. at 3502–03.)  John Doe also saw two other intruders downstairs wearing black clothing.  (Id. at 3506.)  He testified that he "was scared and confused," and that he went back to his room and hid behind his bed.  (Id. at 3507–08.)  John Doe stated that the door to his room remained open, and he saw an armed intruder running toward his younger brother's room.  (Id. at 3506, 3509, 3511.)  The intruder attempted to enter John Doe's brother's room, and was "messing with the handle," leaning up against the door, trying to open it.  (Id.)  After some time, John Doe's mother came into his room and told him to go into her bedroom with his younger brother.  (Id. at 3512.)

John Doe's father testified that on the night of the robbery, he was asleep with his wife in a master bedroom, and his sons, aged thirteen and eleven, were asleep in their rooms.  (Id. at 3416, 3418, 3422.)  John Doe's father woke up because the family's dog was barking, opened the bedroom door, and saw an intruder standing in front of the door. (Id. at 3424, 3426.)  He also saw an intruder come out of his younger son's bedroom, and another intruder near John Doe's bedroom.  (Id. at 3426.)  John Doe's father further stated that he started yelling, the intruders started running, and he followed them downstairs, until one intruder pointed a gun at him, punched him in the head, and told him to get on the ground.  (Id. at 3432–34.)  John Doe's father also testified that the intruders took his wife's purse, his wallet and cellphone from the coffee table in the living room, and a Kindle that was on top of the piano in the living room.  (Id. at 3436–37.)

John Doe's mother testified that on February 11, 2016, at around 2:45 a.m. she woke up because the family dog was barking, and after her husband opened the master

bedroom door, she realized from the tone of his voice that there were intruders in the house.  (<u>Id.</u> at 3464–66.)  She saw John Doe come out of his bedroom with his cell phone in his hand and lean over the railing looking downstairs.  (<u>Id.</u> at 3467.)  She heard several people running down the stairwell and her husband yelling "don't shoot, don't shoot." (<u>Id.</u> at 3468–69.)  John Doe's mother then dialed 911 and asked John Doe to do the same. (<u>Id.</u> at 3470.)  After John Doe's mother heard footsteps coming upstairs, she told John Doe to go back to his room and hide.  (<u>Id.</u> at 3472–73.)  She went to her younger son's bedroom and tried to keep the door closed, while one of the intruders was attempting to open it.  (<u>Id.</u> at 3473–75.)  John Doe's mother further testified that the intruders took her purse, her husband's cell phone, a Kindle, and a bag of quarters that she "put out for [her] son to buy a dance ticket at his middle school."  (<u>Id.</u> at 3482.)

### 3.  The takings were accomplished by force or fear

The record in this case shows that M.N. was in her house with her elderly parents and two minor children, when the masked intruders attempted to enter the locked bedroom where she slept with her children.  (<u>See</u> Lodgment 31 at 2734–36.)  The record also shows that after M.N. unlocked and opened her bedroom door, she saw that her father was held at gunpoint, with his head covered and hands tied behind his back.  (<u>See</u> <u>id.</u> at 2738–39.)  Further, the evidence shows that M.N. was confronted by another armed intruder, who was about six-to-ten feet away from her, and who told M.N. to stop when she was trying to retreat to her bedroom.  (<u>See</u> <u>id.</u> at 2740–41, 2746.)  Notably, M.N. testified that she was "scared," and that she woke up her children and told them to hide under the table in the bedroom.  (<u>See</u> <u>id.</u> at 2739, 2741–42, 2745.)  The jury heard the testimony from M.N. and her parents, and they also read the transcript of the 911 call M.N. made during the robbery.  (<u>See</u> <u>id.</u> at 2715–48.)  A rational jury could have found that the circumstances of the robbery reasonably caused M.N. to fear for her safety, as well as the safety of her elderly father and minor children.

Similarly, the record shows that John Doe saw his father lying face down, while a masked intruder was pointing a gun at him.  (<u>See</u> Lodgment 33 at 3502–03.)  The

evidence also shows that John Doe witnessed another armed intruder run toward his younger brother's door and attempt to forcefully open the door.  (See id. at 3506, 3509, 3511.)  Further, John Doe heard his parents' screams.  (See id. at 3498–3500.)  John Doe testified that he was "scared and confused," and that he went back to his room and hid behind his bed.  (See id. at 3507–08.)  The jury heard John Doe's testimony, as well as this parents' testimony, and read the transcript of the 911 calls John Doe and his mother made during the robbery.  (See id. at 3416–3515.)  Based on this evidence, a rational jury could have found that the circumstances of the robbery reasonably caused John Doe to fear for his safety, as well as the safety of his parents and younger brother.

### 4. M.N. and John Doe constructively possessed the stolen property

California law defines robbery as the "felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  Cal. Penal Code § 211; People v. Hutchinson, 20 Cal. App. 5th 539, 546 (2018).  "[A]n essential element of the crime of robbery is that property be taken from the possession of the victim."  People v. Scott, 45 Cal. 4th 743, 749 (2009) (quoting People v. Nguyen, 24 Cal. 4th 756, 762 (2000)).  Either actual or constructive possession of the property in question is sufficient to satisfy this requirement.  People v. Ugalino, 174 Cal. App 4th 1060, 1064–65 (2009); see also Webster v. Woodford, 369 F.3d 1062, 1072 (9th Cir. 2004) ("California had . . . long held that constructive possession of property by the victim was sufficient to meet the possession requirement of the robbery statute.").

"Constructive possession does not require an absolute right of possession.  For the purposes of robbery, it is enough that the person presently has some loose custody over the property, is currently exercising dominion over it, or at least may be said to represent or stand in the shoes of the true owner."  People v. DeFrance, 167 Cal. App. 4th 486, 497 (2008) (citation omitted).  "Constructive possession requires only that there be some type of 'special relationship' with the owner of the property sufficient to demonstrate that the victim had authority or responsibility to protect the stolen property on behalf of the

owner."  <u>Hutchinson</u>, 20 Cal. App. 5th at 547 (quoting <u>Scott</u>, 45 Cal. 4th at 753).  "A special relationship may include close relatives who live in the same household or visit frequently."  <u>Hutchinson</u>, 20 Cal. App. 5th at 547 (citing <u>People v. Weddles</u>, 184 Cal. App. 4th 1365, 1369–70 (2010)); <u>see also</u> <u>Ugalino</u>, 174 Cal. App 4th at 1065 ("Persons with just such a special relationship include . . . parents living with their adult children.").

Multiple individuals may be in "joint constructive possession of a single item of personal property, and multiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken."  <u>Hutchinson</u>, 20 Cal. App. 5th at 547 (quoting <u>Scott</u>, 45 Cal. 4th at 750).  Further, pursuant to California Civil Code section 50, "[a]ny necessary force may be used to protect from wrongful injury the . . . property of oneself, or of a wife, husband, child, parent, or other relative, or member of one's family, or of a ward, servant, master, or guest."  Cal. Civ. Code § 50. As a result, "a family member may be in constructive possession of property belonging to another family member."  <u>Jones v. Beard</u>, No. CV 13–5642–JEM, 2014 WL 1716163, at *18 (C.D. Cal. May 1, 2014) (citing <u>People v. Gordon</u>, 136 Cal.App.3d 519, 529 (1982)); <u>Hutchinson</u>, 20 Cal. App. 5th at 549 (finding that homeowners' fifteen-year-old daughter had constructive possession of stolen property under the special relationship doctrine).

In this case, the evidence presented at Petitioner's trial showed that M.N. and John Doe lived in the homes with their parents and that they both were in their respective homes during the commission of the crimes at issue.  (Lodgment 31 at 2734–35; Lodgment 33 at 3467.)  The evidence also showed that the intruders stole gold bars, jewelry, watches, and cash from M.N.'s house, (Lodgment 31 at 2534, 2551–52, 2561–62), and cash, a cell phone, Kindle, a purse, and a bag of quarters specifically designated for children (to purchase middle school dance tickets) from John Doe's house, (Lodgment 33 at 3437, 3482, 3484).  Further, the evidence showed that both M.N. and John Doe had access to and authority to protect the stolen property, and that they both exercised that authority by calling 911.  (<u>See</u> Lodgment 31 at 2734–42; Lodgment 33 at 3495–97, 3501–02, 3512.)  Notably, John Doe's mother specifically asked him to call

37

911.  (Lodgment 33 at 3500); see also James v. Kernan, 772 F. App'x 536, 537 (9th Cir. 2019) (finding that the owner's request that the victim of robbery take certain actions to safeguard the property showed that the owner "provided implied authority [for the victim] to do so," and that "a rational factfinder could find that the victim had constructive possession of the property" under California law).  The Court therefore concludes that the trial record contains sufficient evidence to support the jury's finding that both M.N. and John Doe constructively possessed the stolen property under the special relationship doctrine.  See Cal. Civ. Code § 50 (providing that "[a]ny necessary force may be used to protect from wrongful injury" the "property of oneself, . . . parent, or other relative"); Ugalino, 174 Cal. App 4th at 1065 ("Persons with . . . a special relationship include . . . parents living with their adult children."); Hutchinson, 20 Cal. App. 5th at 547–49 (finding that sufficient evidence supported the jury's finding that the homeowners' fifteen-year-old daughter had constructive possession of the stolen property under the special relationship doctrine, where the daughter had a familiar relationship with the homeowners, lived at the house that was robbed, was present during the robbery, and was restrained to prevent her interference with the commission of the crime); see also Bigsby v. Lizarraga, Case No.: 15-cv-1452 BEN (KSC), 2016 WL 11448249, at *5–6 (S.D. Cal. Apr. 4, 2016) (finding that a reasonable jury could conclude that the victim had constructive possession of the stolen property, where, inter alia, the victim lived in the house that was robbed with her parents, and had the requisite "special relationship" and "authority or responsibility to protect the stolen property"), report and recommendation adopted, 2016 WL 4501073, at *1 (S.D. Cal. Aug. 29, 2016).  Viewing the evidence in the light most favorable to the prosecution, the Court finds that there was sufficient evidence from which the jury could have reasonably concluded that M.N. and John Doe had constructive possession of the stolen property.  See id.; see also Jackson, 443 U.S. at 319 ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").

1    Although Petitioner alleges that the "family owned" property theory is not valid

2   under California law, (see ECF No. 1-2 at 36; ECF No. 15 at 17), this Court cannot

3   second-guess the state court's determination of state law.  See Bradshaw v. Richey, 546

4   U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one

5   announced on direct appeal of the challenged conviction, binds a federal court sitting in

6   habeas corpus."); Hicks on behalf of Feiock v. Feiock, 485 U.S. 624, 629–30 (1988)

7   (footnote omitted) ("We are not at liberty to depart from the state appellate court's

8   resolution of these issues of state law.  Although petitioner marshals a number of sources

9   in support of the contention that the state appellate court misapplied state law . . . , the

10  California Supreme Court denied review of this case, and we are not free in this situation

11  to overturn the state court's conclusions of state law.").

12    **5.  Conclusion**

13    The record supports the state court's finding that the jurors were provided with

14  sufficient evidence from which they could draw a reasonable inference that M.N. and

15  John Doe had a possessory interest in the property taken from their respective homes, and

16  that force or fear was applied to M.N. and John Doe to accomplish the takings at issue.

17  Therefore, there was sufficient evidence as required by due process to support

18  Petitioner's robbery convictions on counts 10 and 24, and the state appellate court's

19  decision was not contrary to, nor an unreasonable application of, clearly established

20  federal law.  See 28 U.S.C. § 2254(d).  The Court thus **RECOMMENDS** that

21  Petitioner's claim that there was insufficient evidence to support his robbery convictions

22  on counts 10 and 24 be **DENIED**.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

22cv701-AGS(LR)

**C.      Request for Evidentiary Hearing**

Petitioner asks the Court to convene an evidentiary hearing.  (See ECF No. 1 at 13; ECF No. 15 at 2–3.)  A federal court's discretion to hold an evidentiary hearing is governed by 28 U.S.C. § 2254(e)(2), which provides the following:

> If the application has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously made unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error no reasonable factfinder would have found the applicant guilty of the underlying offense.

Id.  "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state court proceedings." Williams, 529 U.S. at 437.

Petitioner has not established that his request relies on a new rule of constitutional law or a factual predicate that could not have been previously discovered through the exercise of due diligence.  See 28 U.S.C. § 2254(e)(2)(A).  Additionally, Petitioner has not alleged facts that would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found him guilty of the underlying offenses.  See id. § 2254(e)(2)(B); see also Schriro, 550 U.S. at 474 (providing that "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").  Petitioner therefore has not satisfied 28 U.S.C. § 2254 as to any of his claims, and is not entitled to an evidentiary hearing on the claims.

**D.     Motion for Appointment of Counsel**

Petitioner also asks the Court to appoint counsel.  (See ECF No. 1 at 13; ECF No. 15 at 2–3.)  The Sixth Amendment right to counsel does not extend to federal habeas corpus actions by state prisoners.  See Chaney v. Lewis, 801 F.2d 1191, 1196 (9th Cir. 1986); Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice, 816 F.3d 1241, 1244 (9th Cir. 2016) (noting that there is no federal constitutional right to appoint counsel in postconviction collateral attacks on a conviction or sentence in state or federal court). District courts, however, have discretion to appoint counsel in habeas proceedings for "any person financially unable to obtain adequate representation" when "the interests of justice so require."  18 U.S.C. § 3006A(a)(2)(B); see also Chaney, 801 F.2d at 1196 ("Indigent state prisoners applying for habeas corpus relief are not entitled to appointed counsel unless the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations.").  The interests of justice require appointment of counsel when a court conducts an evidentiary hearing on a petition.  See Knaubert v. Goldsmith, 791 F.2d 722, 729–30 (9th Cir. 1986).

In this case, Petitioner merely states that he seeks the appointment of counsel, but does not provide any argument or legal authority for his request.  (See ECF No. 1; ECF No. 1-2; ECF No. 15.)  Further, the Court has reviewed Petitioner's pleadings, and finds that Petitioner has adequately stated his legal claims and facts that he alleges support those claims.  Because an evidentiary hearing is not required and because Petitioner has adequately stated his claims, Petitioner's motion for appointment of counsel is **DENIED**.

## V.  CONCLUSION AND RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS ORDERED** that no later than **October 4, 2024**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **October 18, 2024**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED**.

Dated:  September 6, 2024

_____
Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge

22cv701-AGS(LR)